**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **MDR UNITED LLC**, <br><br> *Plaintiff,* <br><br> v. <br><br> **FLEX NINE EXTERIORS, INC. d/b/a NOVUS ROOFING AND EXTERIORS, et al.**, <br> *Defendants.* | **Case No. 2:25-cv-05073-JDW** |

**MEMORANDUM**

Every sales pitch is a little bit sales and a little bit pitch. The question this case raises is how much fiction a franchisor can weave into its numbers before the law steps in. After MDR United LLC sued Flex Nine Exteriors, Inc., for breaching a franchise agreement, Flex Nine counterclaimed to allege that MDR's initial disclosures to induce the franchise purchases were smoke and mirrors. MDR, on the other hand, says that it told Flex Nine everything that Flex Nine (and its founders) needed to know and that it lived up to its end of the bargain. MDR asks me to dismiss all of Flex Nine's counterclaims, but its arguments go too far. Some of Flex Nine's arguments fail, but many state plausible claims and can proceed.

## I.     BACKGROUND

In late 2022, Amy and Rusty Hansen became interested in purchasing a Mighty Dog Roofing franchise to open and operate in the Salt Lake City, Utah area. Mighty Dog offers

roofing, tarping, gutter, attic insulation, and related products and services. On November 10, 2022, Anthony Spagnola from MDR United LLC (the franchisor), provided the Hansens with an MDR Unit Economics Excel Worksheet (the "Workbook") that included detailed sales projections, cost percentages, and net income estimates associated with the Mighty Dog franchises. The Hansens allege that unbeknownst to them, these figures "were not based on actual franchisee data or any reasonable factual basis, but instead on fabricated assumptions" that MDR inserted into the Workbook "to depict inflated returns." (ECF No. 17 at 22, ¶ 19.) They contend that MDR used the Workbook as its "principal sales tool" to induce them to invest in the franchises. (*Id.* at ¶ 20.) The Hansens also contend that MDR provided them with a Franchise Disclosure Document ("FDD") from 2022 that contained "materially false and misleading" financial performance representations. (*Id.* at ¶ 23.) Relying on these misrepresentations, the Hansens decided to purchase franchises from MDR.

On January 17, 2023, Mr. Hansen entered into two MDR United LLC Franchise Agreements to open Mighty Dog franchises in two different territories in Utah (the "Original Franchise Agreements"). Three days later, the Hansens formed a company called Flex Nine Exteriors, LLC. On March 9, 2023, pursuant to an Assignment And Consent To Transfer Agreement between MDR, the Hansens, and Flex Nine (the "Assignment Agreement"), Mr. Hansen assigned and transferred all of his rights, title, and interest in the Original Franchise Agreements to Flex Nine. The two franchises started business on May 1, 2023.

On May 11, 2023, Flex Nine acquired three additional franchises by way of a Consent To Transfer Agreement (the "Transfer Agreement") and entered into an additional franchise

agreement with MDR (the "Additional Franchise Agreement"). Though MDR had an updated FDD by that time, it did not provide that updated FDD to the Hansens or Flex Nine before Flex Nine entered into the Transfer Agreement or Additional Franchise Agreement. Over the course of their contractual relationship, the Parties entered into various amendments and addenda to the Original Franchise Agreements and the Additional Franchise Agreement (together the "Franchise Agreements"). Flex Nine alleges that it suffered losses as a result of investing in the Mighty Dog franchises.

Flex Nine also alleges that after opening the franchises, "it became clear that MDR had sold the franchise opportunity without possessing the personnel, infrastructure, or resources required to meet its obligations ... under the Franchise Agreement." (ECF No. 17 at 25, ¶ 32.) It contends that MDR breached the Franchise Agreements and contributed to Flex Nine's losses of more than $723,000. On July 15, 2015, Flex Nine sent a letter to MDR purporting to rescind the Franchise Agreements.

On September 4, 2025, MDR filed suit against Flex Nine and the Hansens, claiming that they breached the Franchise Agreements by operating competing roofing businesses in MDR territory, misappropriating MDR's confidential information, failing to pay royalties and other fees, and abandoning the franchise. MDR also asserted trademark violations and violations of state law. On October 29, 2025, Flex Nine filed Counterclaims against MDR, asserting fraudulent misrepresentation (Count I), negligent misrepresentation (Count II), breach of contract (Count III), breach of the implied covenant of good faith and fair dealing (Count IV), and violations of Pennsylvania's Unfair Trade Practices and Consumer Protection

Law (Count V). After the Parties failed to resolve their dispute through mediation, MDR moved to dismiss each of Flex Nine's Counterclaims.[1] That motion is ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Rather than require detailed pleadings, the "[r]ules demand only a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Id.* at 786–87 (same). First, the court must identify the elements needed to set forth a particular claim. *See id.* at 787. Second, the court should identify conclusory allegations, such as legal conclusions, that are not entitled to the presumption of truth. *See id.* Third, with respect to well-pleaded factual allegations, the court should accept those allegations as true and "determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotation omitted). The court must "construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Id.* at

---

[1]    On March 23, 2026, after MDR moved to dismiss Flex Nine's Counterclaims, Flex Nine filed a Notice Of Withdrawing Count V Of Counterclaim. (ECF No. 36.) Because Flex Nine is no longer pursuing this claim, I will not address MDR's arguments as to dismissal.

790 (citation omitted). "In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.    ANALYSIS

### A.    Governing Law

Where, as here, the court has diversity of citizenship jurisdiction over the Parties' claims, I must apply the choice-of-law principles of the forum state to determine which state's law governs those claims. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 596 U.S. 107, 115 (2022). "Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007). The Franchise Agreements and certain addenda and related agreements all provide that Pennsylvania law applies. Specifically, the Franchise Agreements' choice-of-law provision states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania[.]" (ECF No. 1-1, Ex. A at § 18.1.) Given this clear language, the Parties do not dispute that Pennsylvania law governs Flex Nine's breach of contract claims. Instead, the question is whether the choice-of-law provisions apply to Flex Nine's tort claims as well.

"Contractual choice of law provisions ... do not govern tort claims between contracting parties unless the fair import of the provision embraces all aspects of the legal relationship. Courts analyze choice of law provisions to 'determine, based on their

narrowness or breadth, whether the parties intended to encompass all elements of their association.'" *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pennsylvania, Inc.*, 848 F. Supp. 569, 576 (E.D. Pa. 1994) (quotation omitted). Like the choice-of-law provision at issue in *Jiffy Lube*, the Franchise Agreements' choice-of-law provision is limited to "[t]his [A]greement." (ECF No. 1-1, Ex. A at § 18.1.) On its face, then, this narrowly worded provision does not purport to encompass any tort claims that may arise between the Parties.[2]

The choice-of-law provisions from the other related agreements do not make clear that Pennsylvania law governs Flex Nine's tort claims. Certainly, the choice-of-law provisions in those agreements are broader, explaining that the Franchise Agreements' dispute resolution provisions "also apply to any claims or disputes arising out of or related to this Addendum." (ECF No. 1-1, Ex. A at Ex. H § 13; Ex. B at § 6.) But Flex Nine's claims for fraudulent and negligent misrepresentation arise from MDR's alleged pre-sale conduct, not the addenda. MDR also hasn't explained how those claims relate to the addenda. Thus, the Parties' contractual choice-of-law provisions do not apply to Flex Nine's tort claims, and I

---

[2]     Other judges have reached the same conclusion when interpreting similar contractual choice-of-law provisions. *See, e.g.*, *Am. Hearing Aid Assocs., Inc. v. GN Resound N. Am.*, 309 F. Supp. 2d 694, 704 n.14 (E.D. Pa. 2004); *Coram Healthcare Corp. v. Aetna U.S. Healthcare, Inc.*, 94 F. Supp. 2d 589, 593 (E.D. Pa. 1999). In *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 178 (3d Cir. 1992) the Third Circuit applied a contractual choice-of-law provision to the plaintiff's fraudulent inducement claim where the contract said it would be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania. However, *Allegheny Int'l* is not controlling in this instance because—unlike this case—it does not appear there was a dispute as to whether Pennsylvania law governed the plaintiff's tort claims, so the Court did not analyze the breadth of the choice-of-law provision.

will have to determine which state's law applies to those claims based on Pennsylvania's choice-of-law rules.

### B.    Standing

Flex Nine's standing in this case does not depend on whether MDR made the alleged misrepresentations to Flex Nine itself or whether the Hansens assigned their tort claims to Flex Nine. "A defendant is liable to a business entity for fraudulent representations made to a party which induce the formation of a business entity and that entity then does the very things the representations were designed to promote ...." *Simaan, Inc. v. BP Prods. N. Am., Inc.*, 395 F. Supp. 2d 271, 277 (M.D.N.C. 2005). Thus, it does not matter that MDR made the alleged misrepresentations to the Hansens before they finalized Flex Nine's formation. "A corporation cannot be said to know anything except through its members or agents, and representations made to individuals, by reason of which such individuals are induced to form a corporation, may be said to be made to the corporation." *Iowa Econ. Heater Co. v. Am. Econ. Heater Co.*, 32 F. 735, 736-37 (C.C.N.D. Ill. 1887). Since the 1880s, courts from various jurisdictions across the country have recognized this principle.[3] And given the temporal and

---

[3]    *See, e.g.*, *Mammoth Rx, Inc. v. Battah*, No. 19-cv-3323, 2019 WL 8108725, at *3-*4 (C.D. Cal. Dec. 9, 2019); *Simaan*, 395 F. Supp.2d at 277-78; *Nationwide Motorist Ass'n of Mich. v. Freeman*, 405 F.2d 699, 702 (6th Cir. 1969); *Rice v. Price*, 164 N.E.2d 891, 897 (Mass. 1960); *Crystal Pier Amusement Co. v. Cannan*, 25 P.2d 839, 841 (Cal. 1933); *Nye Odorless Incinerator Corp. v. Felton*, 162 A. 504, 508, 510 (Del. Super. Ct. 1931); *Burnham City Lumber Co. v. Rannie*, 52 So. 617, 622-23 (Fla. 1910); *Schoefield Gear & Pulley Co. v. Schofield*, 40 A. 1046, 1049-50 (Conn. 1898); *Iowa Econ.*, 32 F. at 736-37.

geographic scope of the relevant case law, I have no reason to doubt that Pennsylvania and Utah would do the same.[4]

Flex Nine's allegations make it plausible that it can recover based on the alleged misrepresentations that MDR made to the Hansens before they formed Flex Nine. Specifically, MDR provided the Hansens with the Workbook and FDD to induce them to enter into the Franchise Agreements, and within a few days of entering into the Original Franchise Agreements, the Hansens formed Flex Nine to act as the franchisee. As a sophisticated franchisor, it is plausible that MDR expected (or should have expected) Mr. Hansen would assign the Original Franchise Agreements to a business entity rather than remain as the franchisee. Indeed, less than two months later, he did just that, with MDR's consent. Given these allegations, I conclude that Flex Nine has standing to assert its fraudulent and negligent misrepresentation claims regardless of whether (a) Flex Nine existed at the time that MDR made the alleged misrepresentations and (b) Mr. Hansen assigned his tort claims to Flex Nine.

### C.    The Release

At this stage of the proceedings, MDR has not demonstrated that the various releases bar all of Flex Nine's claims in this case. MDR relies on two releases from agreements outside Flex Nine's pleading: (1) the Transfer Agreement from May 11, 2023, and (2) a Royalty Program Agreement from December 13, 2024 (the "Royalty Agreement"). "Generally, 'a

---

[4]    To the extent MDR has a basis to challenge this conclusion, it may raise the issue at summary judgment.

district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022) (quotation omitted). In some instances, however, a court can look beyond the operative pleading and "consider documents **integral to or explicitly relied upon in the complaint** or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss **if the plaintiff's claims are based on the document**." *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 178 (3d Cir. 2024) (quotation omitted) (emphasis added). Flex Nine's Counterclaim does not mention the Transfer Agreement or the Royalty Agreement.[5] Nor does Flex Nine rely on either agreement as a basis for its claims against MDR. Thus, I cannot—and will not—consider those documents when ruling on the motion to dismiss.

Flex Nine did not attach the Assignment Agreement to its Counterclaim, either. However, in its Counterclaim, Flex Nine alleges that "the Hansens assigned their individual ownership interest in the Franchise Agreement to Flex Nine Exteriors, LLC." (ECF No. 17 at 24 n.1.)[6] Thus, I can consider the Assignment Agreement in connection with MDR's motion. When interpreting a release (like any contractual provision), "the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement." *Front St. Dev. Assocs., L.P. v. Conestoga Bank*, 161 A.3d 302, 310 (Pa.

---

[5]    MDR concedes this fact. (*See* ECF 21-1 at 3 n.6.)

[6]    Though it proved unnecessary, Flex Nine also relied on the Assignment Agreement in its opposition to MDR's motion to dismiss as a basis for it to assert claims for fraudulent and negligent misrepresentation.

Super. Ct. 2017) (quotation omitted). "[I]t is 'crucial that a court interpret [the] release so as to discharge only those rights intended to be relinquished.'" *Id.* (same).

"[C]ommercial parties are free to contract as they desire[,]" and this includes releasing unaccrued claims. *Front St.*, 161 A.3d at 310 (quotation omitted). However, "releases are strictly construed so as not to bar the enforcement of a claim that had not accrued at the date of the execution of the release." *Fortney v. Callenberger*, 801 A.2d 594, 597 (Pa. Super. Ct. 2002). In this instance, I find my colleagues' decisions in *MDR United, LLC v. Backporch Partners, Inc.*, No. 25-cv-4532, 2026 WL 1658522 (E.D. Pa. June 5, 2026) and *Schaefer v. HPB Foam LLC*, No. 24-cv-6298, 2025 WL 1888207 (E.D. Pa. July 8, 2025) to be persuasive. Given that I must strictly construe the release so as not to bar claims that had not accrued by March 9, 2023, I agree with Judges Bartle and Hodge that the Release's use of the term "claims" refers to existing claims—*i.e.* claims that had accrued—rather than future or unaccrued claims.[7] Indeed, "[a] claim does not exist before it has accrued." *Schaefer*, 2025 WL 1888207 at *10. And the Release's inclusion of "unknown" claims "presupposes the existence of those claims" and thus "do[es] not encompass unaccrued claims ...." *Id.*

Because "an unknown claim is distinct from an unaccrued claim," *MDR United*, 2026 WL 1658522 at *6, I am not persuaded by the state court's decision in *Front Street*. In addition, "the release in *Front Street* was broader in a key respect: the released claims were

---

[7]    In any event, to the extent the word "claims" in the Release is ambiguous, I must construe that term against the drafter—MDR. *See Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006).

not limited through any specified date." *MDR United*, 2026 WL 1658522 at *7. In this case, on the other hand, the released claims are limited to those that existed as of a specified date—March 9, 2023. And because I cannot resolve when Flex Nine's claims accrued without the benefit of discovery, I cannot determine whether the Release would operate to bar those claims.

### D.     The Contractual Limitation Period And Statutes Of Limitations

The Parties included a "Limitation of Action" provision in the Franchise Agreements. Pursuant to that provision:

> [Flex Nine] further agrees that no cause of action arising out of or under this Agreement may be maintained by [Flex Nine] against [MDR] unless brought before the expiration of one (1) year after the act, transaction or occurrence upon which such action is based or the expiration of one (1) year after the Franchisee becomes aware of facts or circumstances reasonably indicating that Franchisee may have a claim against Franchisor hereunder, whichever occurs sooner, and that any action not brought within this period shall be barred as a claim, counterclaim, defense, or set-off.

(ECF No. 1-1 at § 18.9.)

### 1.     Fraudulent and negligent misrepresentation

The contractual limitations period in the Franchise Agreements does not prevent Flex Nine from asserting its claims for fraudulent and negligent misrepresentation against MDR. By its plain terms, that provision is limited to "cause[s] of action arising out of or under **this Agreement**"—*i.e.*, the Franchise Agreements. (*Id.* (emphasis added).) But Flex Nine's tort claims do not arise out of or under the Franchise Agreements. Instead, those claims are "premised on MDR's *pre-contractual* misrepresentations and omissions—

11

namely, the allegedly false financial performance representations in the Workbook, the misleading Item 19 disclosures, and the related *pre-sale statements* used to induce Flex Nine's principals to enter into the franchise relationship." (ECF No. 37 at 8 (emphasis added).) Thus, the contractual limitations period does not prevent Flex Nine from asserting its tort claims here.

In addition, because I cannot determine when Flex Nine's misrepresentation claims accrued based on the face of the Counterclaim, MDR has not established that those claims are subject to dismissal pursuant to the governing statute of limitations.[8] *See MDR United*, 2026 WL 1658522 at *8.

### 2.    Breach of contract

The one-year contractual limitations period prevents Flex Nine from asserting at least one of its breach of contract claims.[9] Pennsylvania law permits contracting parties to agree to shorten the four-year statute of limitations for breach of contract claims as long as the agreed-upon time period "is not manifestly unreasonable." 42 Pa. C.S.A. § 5501(a). "Courts in this jurisdiction "have routinely held that a one-year statute of limitations is not manifestly unreasonable." *Mr. Sandless Franchise, LLC v. Karen Cesaroni LLC*, 498 F.

---

[8]    Because I cannot resolve the issue without additional facts, I need not resolve whether Pennsylvania's or Utah's statute of limitations applies to Flex Nine's misrepresentations claims at this point in time.

[9]    Because Flex Nine's breach of contract claims based on alleged breaches of Sections 3.7 and 12.5.2 of the Franchise Agreements fail on the merits, as does its claim for breach of the covenant of good faith and fair dealing, I do not consider whether any of those claims is time-barred.

Supp.3d 725, 736 (E.D. Pa. 2020). I agree with that assessment, and Flex Nine does not argue that the one-year limitations period is manifestly unreasonable as applied to its contract-based claims. Thus, Flex Nine had to assert its breach of contract claims within one year after MDR's alleged breach or after Flex Nine became aware of the breach.

Flex Nine admits that "the Franchised Business commenced operation on May 1, 2023." (ECF No. 17 at 4, ¶ 29.) It also alleges that MDR breached Section 3.6[10] of the Franchise Agreement by failing to "provide local SEO optimization **during the first year of operations** ...." (ECF No. 17 at 25, ¶ 33(a) (emphasis added).) Thus, Flex Nine alleges that MDR breached the Franchise Agreements sometime between May 1, 2023, and May 1, 2024. Yet, Flex Nine did not assert this claim until October 2025, even though the claim accrued at the latest on May 1, 2024. It is therefore outside the one-year limitations period.

However, the same is not true with respect to Flex Nine's breach of contract claim based on Section 3.9 of the Franchise Agreements. I cannot dismiss that claim now because it is not clear on the face of the Counterclaim when the breach occurred or when Flex Nine learned of it. *See Rivera v. New Castle Cnty. Police Dep't*, 152 F.4th 147, 153 (3d Cir. 2025).

---

[10]    Section 3.6 provides: "Upon execution of this Agreement, Franchisee must pay to Franchisor or its affiliate a local brand optimization fee in the amount of $12,000 (the "Local Brand Optimization Fee"), in connection with the costs of local SEO optimization for Franchisee's first year of operations. After Franchisee's first year of operations, Franchisor recommends, but does not require, that Franchisee spend a minimum of $1,000 annually for SEO initiatives within Franchisee's Protected Territory through Franchisor or Franchisor's affiliate." (ECF No. 1-1, Ex. A at ¶ 3.6.)

Flex Nine claims that MDR breached Section 3.9[11] by failing to "provide a functioning Call Center field and manage all calls despite collecting a call-center fee ...." (ECF No. 17 at 25, ¶ 33(c).) The Counterclaim is silent as to when MDR failed to provide call center services and when Flex Nine became aware of facts indicating that it may have a claim against MDR for this alleged breach. I cannot resolve this factual dispute at the pleadings stage and, therefore, cannot determine whether the contractual limitations period or the Pennsylvania statute of limitations bars this claim. *See MDR United*, 2026 WL 1658522, at *8.

### E.    Gist Of The Action And Economic Loss Doctrines

Unlike Pennsylvania, Utah does not have a so-called "gist of the action doctrine." But this apparent difference in terminology does not amount to a conflict between the two states' laws. In Pennsylvania, there is very little—if any—daylight between the economic loss and gist of the action doctrines. Indeed, both doctrines focus on the allegedly breached duty. Where the duty arises from a contract, the plaintiff may not proceed with a tort claim. *See In Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018) (economic loss doctrine); *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (gist of the action doctrine). Utah applies the same rule—"the

---

[11]    Section 3.9 provides in relevant part: "Franchisor, or Franchisor's affiliate HPB Call Center d/b/a Powerhouse Call Solutions, has established a call center ("Call Center") which will field all calls and manage prospective and existing Mighty Dog Roofing customers and route/assign work orders/inquiries as Franchisor deems necessary in Franchisor's sole discretion. Upon execution of this Agreement, Franchisee must pay Franchisor or Franchisor's affiliate HPB Call Center d/b/a Powerhouse Call Solutions (as Franchisor designates) all associated start-up fees, monthly fees, lead fees and surcharges associated with each scheduled lead (collectively, the "Call-Center Fee"), which are subject to change at any time. In addition to the Call Center Fee, Franchisee must pay $15 per scheduled lead." (ECF No. 1-1, Ex. A at ¶ 3.9.)

economic loss rule applies where a party's tort claims are entirely duplicative of its contract claims." *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193, 198 (Utah 2018). In this instance, where there is no conflict between the two states' laws, I may refer to both interchangeably. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 229 (3d Cir. 2007) (citation omitted). The economic loss doctrine does not prevent Flex Nine from asserting its misrepresentation claims because they are not duplicative of its breach of contract claims.

In its Counterclaim, Flex Nine contends that MDR breached the Franchise Agreements in four specific ways, by failing to: "(a) provide local SEO optimization during the first year of operations … in breach of Paragraph 3.6 of the Franchise Agreements; (b) establish national advertising and brand promotion in breach of Paragraph 3.7 of the Franchise Agreement; (c) provide a functioning Call Center field and manage all calls … in accordance with Paragraph 3.9 of the Franchise Agreement; and (d) conduct market appropriate local advertising and promotion … in breach of Paragraph 12.5.2 of the Franchise Agreement." (ECF No. 17 at 25, ¶ 33.) These are the contractual duties that Flex Nine contends MDR has breached. MDR offers no support for its assertion that Flex Nine's tort claims are based on the same subject matter.

On the contrary, Flex Nine's misrepresentation claims are based on MDR's alleged pre-contractual disclosures that contained fabricated assumptions, inflated returns, and false and misleading financial performance representations. The misrepresentation claims arise from a breach of the societal "duty to speak the truth" rather than any contractual obligation. *Ennis v. Alder Prot. Holdings, LLC*, No. 19-cv-512, 2021 WL 409785, at *10 (D. Utah Feb. 5,

2021). And because those claims do not "overlap" with the breach of contract claims, *HealthBanc*, 435 P.3d at 197, the economic loss doctrine does not bar them.[12]

### F.    Failure To State A Claim

#### 1.    Fraudulent and negligent misrepresentation

##### a.    Reasonable reliance

Under both Pennsylvania and Utah law, Flex Nine must plead reasonable reliance to state its claims for fraudulent and negligent misrepresentation. The question is whether the Franchise Agreements' integration clause[13] or no-reliance provision[14] prevents Flex

---

[12]    *See, e.g.*, *Sefcik v. Cravey*, No. 23-cv-807, 2025 WL 1124530, *6 (D. Utah Apr. 16, 2025); *Ludvik Elec. Co. v. Vanderlande Indus., Inc.*, No. 21-cv-462, 2023 WL 8789379, *8 (D. Utah Dec. 19, 2023); *CounselNow, LLC v. Deluxe Small Bus. Sales Inc.*, 430 F. Supp. 3d 1247, 1259-60 (D. Utah 2019); *Ennis*, 2021 WL 409785 at *8-*9 (D. Utah Feb. 5, 2021).

[13]    The integration clause provides: "This Agreement contains the entire Agreement of the parties. There are no representations either oral or written, except those contained in this Agreement. This written Agreement includes all representations between the parties. This Agreement may not be modified except by a written document signed by both parties. Nothing in this Agreement or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document furnished to Franchisee." (ECF No. 1-1, Ex. A at § 22.1.)

[14]    The no-reliance clause provides: "NO SALESPERSON, REPRESENTATIVE OR OTHER PERSON HAS THE AUTHORITY TO BIND OR OBLIGATE FRANCHISOR EXCEPT FRANCHISOR'S AUTHORIZED OFFICER BY A WRITTEN DOCUMENT. FRANCHISEE ACKNOWLEDGES THAT NO REPRESENTATIONS, PROMISES, INDUCEMENTS, GUARANTEES OR WARRANTIES OF ANY KIND WERE MADE BY FRANCHISOR OR ON FRANCHISOR'S BEHALF WHICH HAVE LED FRANCHISEE TO ENTER INTO THIS AGREEMENT. FRANCHISEE UNDERSTANDS THAT WHETHER FRANCHISEE SUCCEEDS AS A FRANCHISEE IS DEPENDENT UPON FRANCHISEE'S EFFORTS, BUSINESS JUDGMENTS, THE PERFORMANCE OF FRANCHISEE'S EMPLOYEES, MARKET CONDITIONS AND VARIABLE FACTORS BEYOND FRANCHISOR'S CONTROL OR INFLUENCE. FRANCHISEE FURTHER UNDERSTANDS THAT SOME FRANCHISEES ARE MORE OR LESS SUCCESSFUL THAN OTHER FRANCHISEES AND THAT FRANCHISOR HAS MADE NO REPRESENTATION

Nine from establishing reasonable reliance. Though that question implicates both contract law and tort law, I conclude that it is primarily a tort question because reliance is an essential element of Flex Nine's misrepresentation claims. Thus, to resolve this question, I first must determine whether there is a conflict between Pennsylvania and Utah on this issue and, if so, which state's law applies.

### i.        Conflict of law

Initially, there appears to be a true conflict between Pennsylvania and Utah law with respect to whether MDR can rely on the Franchise Agreements' integration clause and no-reliance provisions to defeat Flex Nine's fraudulent misrepresentation claim. In Utah, "a party may not insulate itself from liability for its 'own fraud' in a provision of a contract." *Reperex, Inc. v. Coldwell Banker Com.*, 428 P.3d 1082, 1088 (Utah 2018) (quotation omitted). Thus, "a contract may be rendered unenforceable by proof of reliance on fraud in the inducement," and a defendant cannot rely on a release, integration clause, or no-reliance provision to escape liability for fraud. *Id.* at 1089. That means that under Utah law, Flex Nine could proceed with its fraudulent misrepresentation claim. However, in the absence of fraud, the no-reliance provision remains valid. *See Lamb v. Bangart*, 525 P.2d 602, 608 (Utah 1974). Thus, the no-reliance provision in the Franchise Agreements would prevent Flex Nine from establishing its *negligent* misrepresentation claim, to the extent that claim is based upon

---

THAT FRANCHISEE WILL DO AS WELL AS ANY OTHER FRANCHISEE." (ECF No. 1-1, Ex. A at § 19.2 (original emphasis).)

alleged misrepresentations in the Workbook. However, Flex Nine could still rely on the FDD

to prove its negligent misrepresentation claim, as the integration clause makes clear that

MDR did not "disclaim the representations [it] made in the [FDD] furnished to [Flex Nine]."

(ECF No. 1-1, Ex. A at § 22.1.)

The outcome would be different under Pennsylvania law, at least with respect to Flex

Nine's fraudulent misrepresentation claim. "[A] no-reliance clause in an integrated contract

precludes fraudulent inducement claims that depend on a precontractual

misrepresentation." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 214 (3d Cir. 2022). The

same is true for negligent misrepresentation. *See, e.g., Coram Healthcare Corp. v. Aetna U.S.

Healthcare, Inc.*, 94 F. Supp. 2d 589, 595 (E.D. Pa. 1999). Thus, Pennsylvania law would prevent

Flex Nine from proceeding with its fraudulent misrepresentation claim, so I must determine

which state's law applies.[15]

### ii.    Choice of law

To determine which law governs a dispute, Pennsylvania courts apply a "flexible rule

which permits analysis of the policies and interests underlying the particular issue before the

court." *Griffith v. United Air Lines, Inc.*, 203 A.2d 796, 805 (Pa. 1964). Under this approach,

courts apply the law of the state that "has the most significant relationship to the occurrence

and the parties." *Melmark, Inc. v. Schutt by & Through Schutt*, 206 A.3d 1096, 1107 (Pa. 2019).

---

[15]    There is no conflict as to the negligent misrepresentation claim. That claim is barred under both states' laws, to the extent that it is based on alleged misrepresentations in the Workbook, as set forth above.

"The overriding consideration is which state has 'a priority of interest in the application of its rule of law' so as to vindicate the policy interests underlying that law." *Id.* (quotation omitted).

In this case, Utah appears to have the greater interest in having its law applied. Flex Nine is a Utah company whose principals are Utah residents. Flex Nine contends that MDR induced it into purchasing five different franchises across Utah, and that is where the alleged injury occurred. Based on these facts, Utah has a significant interest in having its law applied. Pennsylvania, on the other hand, bears very little connection to Flex Nine's counterclaims, aside from the fact that MDR's headquarters are here. Indeed, as the proponent of Pennsylvania law, MDR does not mount a meaningful argument as to why Pennsylvania has the most significant relationship to Flex Nine's tort claims. Thus, Utah law governs those claims. As a result, the Franchise Agreements' no-reliance provision does not prevent Flex Nine from pursuing its fraudulent misrepresentation claim, and Flex Nine can pursue its negligent misrepresentation claim based on alleged misrepresentations in the FDD only.

Finally, whether Flex Nine's allegations contradict various disclaimers and statements that MDR included in the FDD is not something I can resolve at the pleading stage. *See, e.g.*, *MDR United*, 2026 WL 1658522 at *11. Indeed, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022). Thus, any alleged contradiction in the FDD is not a reason to dismiss Flex Nine's misrepresentation claims at this stage of the proceedings.

### b.　　Specificity

Flex Nine has alleged sufficient facts as to its fraudulent misrepresentation claim to meet the heighted pleading standard under Federal Rule of Civil Procedure 9(b). "Rule 9(b) requires a plaintiff to identify 'the who, what, when, where and how' of the alleged fraud." *MDR United*, 2026 WL 1658522 at *9 (quotation omitted). Flex Nine's Counterclaim contains the relevant information. Indeed, Flex Nine alleges that on November 10, 2022 (the "when"), Anthony Spagnola from MDR (the "who"), provided the Hansens with the Workbook that contained allegedly false and misleading information (the "what"). The Counterclaim also pleads facts that speak to MDR's intent. MDR's representatives, like Mr. Spagnola, used the Workbook as "MDR's principal sales tool in soliciting the Hansens' investment" (the "how"). (ECF No. 17 at 22, ¶ 20.) Yet, "MDR *knew* that its internal franchise performance data and cost structures did not support the financial performance representations contained in the Workbook." (*Id.* at ¶ 21 (emphasis added).) The Counterclaims contain similar assertions surrounding the alleged misrepresentations in the FDD as well, and they are sufficient to meet Federal Rule of Civil Procedure 9(b)'s specificity requirements.

### 2.　　Breach of contract

Flex Nine has stated a plausible breach of contract claim based on MDR's alleged breach of Section 3.9 of the Franchise Agreements. As such, Count III of the Counterclaim is not subject to dismissal. However, Flex Nine's remaining breach of contract theories are not plausible based on the face of the Counterclaim and its integral documents, so Flex Nine cannot proceed with those specific claims.

20

To state a claim for breach of contract under Pennsylvania law, Flex Nine must allege: "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages." *Doe v. Univ. of Scis.*, 961 F.3d 203, 211 (3d Cir. 2020) (cleaned up) (quotation omitted). The Franchise Agreements require MDR (or its affiliate) to utilize its call center to field calls from customers in exchange for a monthly fee. (*See, e.g.*, ECF No. 17-1 at § 3.9.) There is also a flat fee for each scheduled lead. In its Counterclaim, Flex Nine alleges that MDR breached the Franchise Agreements by failing to "provide a functioning Call Center field and manage all calls despite collecting a call-center fee in accordance with Paragraph 3.9 of the Franchise Agreement[.]" (ECF No. 17 at ¶ 33(c).) Flex Nine also alleges that it "fully performed" all of its obligations under the Franchise Agreements (*id.* at ¶ 54), which I can infer includes its payment of the monthly fees for the call center service. Accepting these factual allegations as true, these facts state a claim for breach of contract of Section 3.9 of the Franchise Agreement.

However, Flex Nine has failed to state a claim based on alleged violations of Sections 3.7 and 12.5.2 of the Franchise Agreements because MDR did not owe any obligations to Flex Nine under either provision. Under Section 3.7, MDR "reserve[d] the right to establish a national brand fund for advertising and brand promotion ...." (ECF No. 17-1 at § 3.7.) It did not agree that it would create such a fund and cannot have breached the Franchise Agreements by failing to do so. Likewise, Section 12.5.2 does not require MDR to "conduct market appropriate local advertising and promotion." (ECF No. 17 at ¶ 33(d).) On the contrary, that provision requires *Flex Nine* to spend 5% of its monthly gross

revenues "on local advertising and promotion in accordance with [MDR's] standards and specifications ...." (ECF No. 17-1 at § 12.5.2.) Because this provision does not impose a marketing obligation on MDR, MDR cannot be in breach for failing to conduct marketing activities. Thus, Flex Nine cannot proceed with its breach of contract claims based on Sections 3.7 and 12.5.2 of the Franchise Agreements.

### 3. Breach of implied covenant of good faith and fair dealing

Finally, I will dismiss Flex Nine's claim for a breach of the implied covenant of good faith and fair dealing because there is no such independent cause of action under Pennsylvania law. While "Pennsylvania law generally recognizes a duty of good faith in the performance of contracts, this duty 'does not create independent substantive rights.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 432 (3d Cir. 2013) (quotation omitted). Instead, it "is subsumed in a breach of contract claim." *Id.* (same). "Courts have utilized the good faith duty as an interpretive tool to determine the parties' justifiable expectations in the context of a breach of contract action, but that duty is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." *Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000). Because there is no standalone claim, I will dismiss Count IV of the Counterclaim.

### IV. CONCLUSION

Flex Nine can proceed with its claims for fraudulent and negligent misrepresentation, and it has stated a claim for breach of Section 3.9 of the Franchise

Agreements. However, the rest of Flex Nine's Counterclaims are subject to dismissal, as set forth above. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

July 9, 2026